I want to address three issues in the ten minutes that I have. The first issue is it relates to venue in the case. The government had stated in their brief, in their response to our brief, that we did not preserve the issue of venue. We believe we have preserved the issue of venue. You should have spent a lot of time on it in your brief, my goodness. You really thought that was the Zinger winner? Well, I think it's one of them, Your Honor. I think it does have some import in the case, and I think it's a major factor. But Mr. Uriarte adopted Mr. Pierre's motion, Rule 29 motion, and made his own motion, and that was in the record at 9850. And then even though he didn't have to, Mr. Uriarte renewed that motion at the close of the rebuttal by the government. And additionally, there was a venue instruction given to the jury. And so obviously it was apparent from the evidence that venue was an issue. And according to U.S. v. Strain, a Rule 29 motion does preserve venue for review. And so we believe we have preserved it, and it's eligible for the court to review de novo. We believe also that venue is an issue in the case because there is no ties other than the testimony of the co-defendants that they may have traveled through the Eastern District of Texas. Other than the testimony, there's no evidence corroborating that in the case. And the court in the government cites Romans for two propositions, one in their 28-J letter that Romans forecloses any argument on venue. I don't think that the Romans case stated that, having been the one who tried Romans and argued it to this court. I don't think the Romans decision forecloses any argument in venue in drug cases. And additionally, I think the distinguishing factor of Romans is that in the Romans case, there was a map that was introduced into evidence that the driver said he followed this route through the Eastern District to deliver drug proceeds. And so there was some evidence in that. Additionally, there was a traffic citation that that person received showing that he was in the Eastern District. Well, why do you doubt it since, I mean, you know, unless they were flying, they were using the highways to transport the drugs, and they started in Houston and they ended in Picayune, Mississippi. Pretty hard to drive that route without going through the Eastern District. Well, I think the court can doubt it because based on the jury's verdict in the court. Well, how would they have gotten there? Well, I mean, I think the point is you have to rely on what they've said and how they got there. And just because they said they drove there in and of itself doesn't support that. But wasn't your client given a timeline when to deliver the cocaine? I mean, you're talking about a map, but isn't a timeline sort of the same thing, takes a certain amount of time to get from here to there depending on where you're going? Yeah, it could be. But I think the distinguishing fact is that based on the testimony of the cooperators here, which is basically all that you had in this case as related to Mr. Uriarte, and then you couple that with the, in our view, the inconsistent verdict with the jury because they were charged with the conspiracy to distribute both cocaine and marijuana. And the jury verdict came back saying they were not guilty of the marijuana. And so then the question becomes what did the jury rely on to determine venue? If they didn't believe the cooperators as it related to marijuana, how could they then believe what they had to say as it related to where they drove as well as whether or not they entered into a conspiracy with Mr. Uriarte and distributed cocaine? And so that inconsistent verdict then ties in into the sufficiency of the evidence argument of whether or not there was sufficient evidence to support a finding of guilt against Mr. Uriarte because the same people that testified at trial saying that he was involved in a cocaine conspiracy also testified that he was involved in a marijuana distribution conspiracy, which the jury clearly rejected by their verdict of not guilty as it related to marijuana. So we know that as far as the court and jury verdicts can be sustained on the testimony of cooperators unless it's incredible, but I think the jury, by their finding, inconsistent verdict has said we believe their testimony was incredible if they didn't believe it as to marijuana because the testimony was the same. There was nothing distinguishable between the testimony they talked about as cocaine as it related to marijuana and now you have a jury verdict that says they're not guilty of marijuana but they are guilty of cocaine. And so therefore we believe the inconsistent verdicts clearly show that there was not sufficient evidence to support a finding of guilt, especially as it relates to Mr. Uriarte, because there was no drug seizures at the tire shop. There was no Title III wiretaps of him having any conversations with anyone. And so there was no evidence other than this historical testimony from these cooperators to support the finding of guilt in the government's case. And so I think when you look at those two, the evidence was insufficient as related to Mr. Uriarte just based on the fact that the jury found him not guilty of the marijuana when there was clearly testimony from witnesses that says he was. And so therefore we believe that the evidence was insufficient as it related to the cocaine conspiracy case. And then moving on, that inconsistent testimony or verdict then relates, moves on to the sentencing issues because at sentencing we challenged the drug quantity that he was responsible for and that was largely based on the testimony of Mr. Garcia, a majority of it as it relates to Mr. Garcia. And once again, he was another witness that the jury rejected his testimony as it relates to marijuana. So then how is his testimony or reliance on drug quantity, how can the court then rely on that to sentence him when a jury has disregarded his testimony as it relates to the marijuana? So I think that's an important issue. And then also as it relates to the enhancement as it goes to him being a leader or an organizer, obviously there was an objection to the four-level enhancement, but Judge Schell said he was good for the three-level enhancement. We don't think there was sufficient evidence to even support the three-level enhancement because I think what Judge Schell said, well, if he's on the property and he's living in a stash house, I don't think it's a stretch to say that he was telling him what to do, but we don't see any evidence in the record that shows that he actually told him what to do, how to do it, directed him in any way to then necessarily support even a three-level enhancement. How many drivers testified? I don't have the exact number, but several drivers did testify. But Judge Schell, as it related to drivers, in the sentencing, did not believe he did not have any control or as much control over the drivers and therefore went from the four-level to the three-level. So I don't think the drivers factored into his decision to hold him responsible. Well, he did have a lot of money, did he not? He did have a lot of money. That was shown by the evidence in the case. But I think, once again, the fact he had a lot of money. He just saved his pennies, huh? He could have been a good saver, but that also gets into the confusion of what the government wants to then say because he's not found guilty of marijuana, the money must have come from cocaine. But, once again, we get into this inconsistent verdict situation where is the money that he had even illegal drug proceeds or is it legitimate proceeds that he didn't report? If I understood it, they figured out that he got $150,000 from tar shop customers in three years, but he had $1 million in the bank. I think my recollection was that he had about $450,000 from the tires, but he had deposited $1 million in the bank. But I also would say, as it relates to the $1 million in the bank, if you're engaged in an illegal activity, would you put $1 million into a bank that then becomes traceable? So I think there's a logical inference that just because he put $1 million in the bank, therefore he's engaging in cocaine distribution because most people, if they don't want to be detected, the last thing they would do is put it into a bank account that then becomes traceable. So that didn't make sense to me that a jury could rely on that to say that's evidence of him engaging in a cocaine distribution conspiracy. So I think when you look at the evidence in the case, especially, and I keep coming back to this inconsistent verdict, I think we have to give great deference to jury verdicts, and I know that's the standard, but when you look at their inconsistent verdict, you can't square the two of them, in my mind, based on the evidence that was presented. And so I think clearly when they found him not guilty of the marijuana conspiracy, the evidence then was sufficient on the record to find him guilty of the cocaine conspiracy. And for those reasons, we think you should reverse his conviction and render it as an acquittal. Or in the alternative, if the court finds that it's sufficient, that he at least go back for sentencing as the drug quantity as well as the leader organizer is not supported by the evidence or the record in the case, and we think that would be the appropriate response. And then finally, as it relates to venue, I don't think there was any evidence that Mr. Uriarty was in the Eastern District and should not have been prosecuted in the Eastern District. Thank you. Mr. Gretzer. Good morning, Your Honors. May it please the Court, Seth Gretzer for the appellant here. I would like to begin by addressing our evidential challenge to the drug dog false alert, Bart J., and then turn to the summation misconduct issue. Common to both of these issues, Your Honors, I think is a very important temporal dimension. With regard to the drug dog search of Bart J., it's striking that this was obviously litigated extensively pretrial. There was a half-day hearing in front of the magistrates, experts on both sides, and the magistrate judge denied the suppression aspect but granted the motion in limine on 403 relevance grounds. The government that was then obviously adopted by the Article III judge, the government did not move or did not object to that report and recommendation. They never said another word about it, even during this lengthy trial. The first thing, the first time this came up during the trial that the government wanted to attempt again to get this evidence in was on July 3rd, the morning of July 3rd, and Judge Schell was rather irritated at the prosecutor. He said, Why am I just hearing about this now? And she didn't really have a good reason, but the judge sent the jury out, and then they had a hearing, and he, of course, allowed it in on 403 grounds. I think that's important because it accentuates the harm. It shows, as we argued extensively in the brief, that the way my client went into the trial, this was necessarily a dry drug case, and as much as the government's contention was that my client was this big-time bulk reseller of drugs, they never could actually find him with any drugs anywhere in the house. He took $1,000 from the side for doing odd job construction. That's not something most big-time drug dealers do. Didn't they find a bunch of drugs or cash at another house that he owned? Yes, there was. We say everything is relative, Judge. There was in that contested Nike shoe box, I think it was about $80,000, although a different drug dealer's own house had $89,000, and of course there was this issue whether or not the shoes matched, whether the shoes were made in Indonesia versus China or something like that. But again, Judge Jones, the point would just be that the unfortunate reality for the government is that my client walked into and more importantly structured a defense in this case around the fact that we have these witnesses who will come in here, we don't think they're telling the truth, and what does the government have on the other side by way of physical possession? They did not have a wet drug case. They only had a dry drug case. The only way they were able to shift that was by getting in the testimony of, this goes to my relevance argument, of what? In and of itself, it's evidence that a dog wagged its tail in the house, and yet the agent was very clear they could not actually find any drugs there. Even more specifically, the agent was clear that that dog is trained to sniff the litany, a laundry list of various drugs. But that officer, Dominguez, I think was his name, had no idea what drug the dog sniffed. What if that dog sniffed, thought it sniffed, marijuana, even though no one could even find any trace element of marijuana? And, of course, it was marijuana that the jury specifically rejected in the special verdict form. That would go to our point. If the harm element here, just let me see how time is going. On page 3797 of the record, the question was asked directly, this may well have been a false alert. You have no way of knowing if Bart J. was actually alerting to an odor or the presence or former presence of some substance or whether Bart J. was falsely alerting, do you? And he would not answer the question. Explain how this was not harmless error. Oh, yes, absolutely, Judge Jones. That's because, as I said, this allowed the government to take what had been a dry drug case and turn it into a possession case. I think in the brief I said they were able to alchemize a dry drug case. In other words, this was the only piece of evidence the government could get in front of the jury. I don't know the terms dry drug and wet drug until you spoke today. I understand what you're saying. Yes. How can we expect that the jury would have, you know, cared about such a difference? Well, I mean, I think for no other reason I would like to think they cared because that was, of course, Mr. Pierre's core defense, how he structured his defense in the case. With regard to, I know direct and circumstantial evidence are weighed equally, of course, and yet, again, if the government is not like they gave any advance notice they were trying to do this, it wasn't until we were well into trial that this was put forward. And I think an average juror is going to be, oh, there's a reason that the Supreme Court has consistently said in the different Fourth Amendment context that, you know, these drug dogs are incredibly reliable because they have such a high success rate. And yet here the magistrate said this was an issue of first impression as far as he could tell in his order. It was the first time anyone could find a false alert type situation. As it's come out with the 28J briefing, the government, we're not challenging on expert Daubert grounds. There's probably a reason that this is, as far as I can tell, I can represent to the Court, an issue of first impression on the 403 undue prejudice grounds. And the specific facts of this case where, I'm sorry if it's not, my phraseology is wet drug versus dry drug case. This was the only evidence the government had that would take it out of that nonpossession and make it an actual possession case. If I could, since I'm at the halfway point, cede to my summation misconduct issue. I think one of the differences here in the case that we've brought you as opposed to other summation misconduct cases, quite most specifically Aguilar, is that the government, as I understand from their reply, they say, oh, if nothing else, that was an invited error. This was simply mere rebuttal type evidence. And unfortunately, when I say rebuttal, that they said these various things about the agents aren't lying to you and the U.S. Attorney's Office wouldn't do that, things of that nature. Unfortunately, that's not what happened here, very specifically at page 4563 of the record. This is the very first page after the different prosecutor, Lopez, did the, you know, thank you for sitting here for three weeks. She said, quote, the defense wants so badly for you to believe it's all just a collaboration. Everyone just got it together. This was not, this was the government's opening, not rebuttal. This is not, they said, this witness said so forth and I suggest this inference you draw from it. Then at the conclusion of the first day of the opening arguments, 4573, what happened here was the government was going to go on one day and the next morning all the defendants were going to start. On 4573, quote, tomorrow morning you're going to sit here for about five hours. Why the cooperators are not telling the truth. Then she said, well, it is their incentive to cooperate with the government. We have never been shy about it. In other words, my point would be that I don't think the government can say that this was invited. In other words, they came back and fairly rebutted something the defendants had said in closing. The government laid this all out in their opening aspect of the closing. Let me ask you a relevant question. The evidence suggests that Mr. Pierre had, if he was involved in this large cocaine trafficking, had invested in multiple properties and apparently was a very rich man, not just from doing home remodeling. How come you're court appointed? Who believed his affidavit that he couldn't afford counsel? It was either Judge Schiller or the magistrate's judge. I don't recall at the moment. I just think that's bizarre. I don't know anything more about it. I was appointed last June. Yeah, I know. I'm not questioning that you were appointed. I'm just saying this is bizarre. I think the issue may have been, I don't know particularly. Because I assume they're moving to forfeit all these properties. I'd have to go back and look at the forfeiture contentions, Judge. I don't know if I have that in front of me. Right. I think the issue might have been, and there was a pretrial motion to exclude the wealth of his mother, who I understand is a somewhat prominent businesswoman here in New Orleans. And, of course, they said that was largely irrelevant, mother's wealth. They did have other testimony about money going back and forth between Mr. Pierre and his mother. It may have been that mother was hiring these other prominent lawyers and simply chose not to do that for the appeal. But I'm, of course, not obligated to continue doing that in the future. It's because she did it in the past. But I don't have any information about that one way or the other. There's no doubt Mr. Pierre had a large section of excellent lawyers, Mr. Highschool and Mr. Mateja, people like that, who laid out and preserved pretty extensively the objections, the expert witness affidavits, things that sort of presented these issues, made sure they were preserved and robustly presented for the argument here today. I would just ask the Court in my remaining time, when you look at our summation misconduct issues, and we accentuated, obviously, or highlighted, complained about two very specific instances, the one on page 4753 where the other prosecutor, Ms. Rutan, said, quote, came up with this plan to frame, as she's talking about the agents. Agents came up with the plan to frame. Two pages later, 4755, she asked the question, are the agents lazy and not doing a case, or are they crooked? That is obviously very different language or averse to very different things than anything that was said about these agents. Framed, to my mind, means planting evidence, things of that sort. Crooked means dirty in the sense of taking a bribe or something like that. No defendant ever made a contention in this case that prosecutors were planting evidence or were on the take or anything like that. I don't see how the government can argue that the prosecutor, having first laid down this theme in the first part of their closing statement, then came back on rebuttal with this language unhinged from any contention that any defendant had made without going into the impermissible area that Aguilar specifically reversed on. All right. Thank you. Mr. Gretzer. Mr. Williford. May it please the Court, Counsel. Your Honors, what I would like to address to the Court is three issues. Two of them are the same, and I just want to cover a couple of things first. The first is venue, and I know the Court is curious as well. There's evidence that they drove through. The only evidence is testimony from four or five, six co-conspirators that said, well, we drove through the Eastern District. And I know one of the judges said, well, how do you get from Houston to Picayune, Mississippi, where Mr. Kekau lived and never had been in Texas, in the Eastern District or in Texas at all, ever, before he was arrested and drugged to court by the U.S. Marshals, is you have these witnesses, and the Court said, well, you could fly. Well, what level does it give venue if you fly over the Eastern District in a helicopter? If you get low enough, does that give jurisdiction for venue? Or a commercial airplane, does that get you out of the jurisdiction? Flying with a whole bunch of tires loaded with cocaine. That's the allegation, but we have no evidence, no physical evidence in this three-week trial, no physical evidence to support that. You have the testimony of seven, six, seven or eight, depending on who they're testifying against. And specifically, as it relates to venue, you've got Jorge Gaitan, Fabian Lara, Edward Contreras saying, well, they drove through the Eastern District with multiple kilos to Picayune, Mississippi, and that bill helped unload. That goes into the second issue of sufficiency. Is that sufficient evidence to find them guilty? Mr. Whalen's argument that it's inconsistent. They found Mr. Kikau not guilty of any marijuana. Found guilty of the lesser, over 500 grams, but less than five kilos. Did the jury know that one of his aliases was crackhead, Bill? Your Honor, that's interesting. I filed a pretrial motion to exclude that. I'll bet you did. It was held and never brought up for trial. The judge granted it at the end of the trial, and it wasn't until I filed the appeal that the court rejected mine because the style wasn't correct, and at that point in time I felt, I guess, somewhat defeated. But the jury never heard that word because it had never been used. It was something the prosecutor just made up. So you go to sufficiency, and you go back to the same witnesses, Contreras, Garcia, Lara, and Gaitan, that talk about Bill, not, oh, that guy. That looks like him, if the court looks at the record. I think that's him, an old guy named Bill. What you have is every one of those witnesses testified that their reaction or relationship with Mr. Kikau, or Bill because they never identified him as Kikau, would be, at best, 10 kilos of cocaine, 15 kilos of cocaine, 7 to 10 times, 2 to 3 times. The jury found him not guilty of over 5 kilos. There's no evidence that any one of those persons, if you believed it, you'd have to believe just part of Mr. Contreras' testimony that, well, it wasn't three deliveries. It was only one, and it was less than 5 kilos because if you believe any of that, any of their one testimony, he would have been found guilty of a higher level. Now, the only evidence that could support that conviction would be Michael Jackson's testimony, Arthur Pierre's cousin, which was so incredible that I think he testified that he had smoked crack the week before testifying, and he testified that one time I saw Bill with one kilo of cocaine. And so you get to that evidence goes to my, well, the government wants to also point out that the agent, Justin Marshall, that my client said, did y'all find any cocaine? Well, the court looks at the exhibits and the record, and there's hundreds of officers out there searching that property when Mr. Kekal was not arrested. And then they're saying, well, did you find any cocaine? Nobody told him they were looking for cocaine when there's 100 drug officers on the property. I don't think the court should give that any credibility. So we go to the sentence. If the court doesn't reverse it, the government concedes that the stash house enhancement should be removed. So we go to whether or not Mr. Kekal should receive a minimal role. The whole entirety of the record shows, at best, Mr. Kekal, if he were involved in the drug, lived in a house, took care of some dogs, and may occasionally, one time with one kilo, helped out with some drugs. And if you look at the whole case— You said that was Mr. Jackson's testimony and that Mr. Jackson was incredible. Well, I agree. But if the court believes that, then we're just at the sentencing issues now. What would the proper sentencing range be without the enhancement? I believe it would be 41 months to—and I have it in my brief—but the minimum would be five, so 60 months. And then you get to the drug level. Judge Schell followed the jury's verdict and found him responsible for no more than five kilos, which is by preponderance, and the government's response is, well, I have to put on evidence. The evidence is there in front of the trial. The jury found him not guilty. There's no other drugs outside of what was presented during that trial that the court relied upon. The jury found him not guilty of all that, except for one kilo, if you base it on the verdict and we're asking the court to reverse the conviction and in the alternative remand it for sentencing consistent with my arguments. Thank you. Mr. Wolfe? All right. Over to you, Ms. Hagan. Wherever else you plan to start, go ahead and deal with the venue and get that one done. Okay. Good morning. May I please support? Before I address the venue, if it's okay, I'd like to answer the question about what Mr. Kekau's sentence would be without the enhancement. He would be at a total offense level of 30, which is a range of 97 to 121 months. So going to venue, like Mr. Hoyland, I, too, argued the Romans case, and in the Romans case the judge found that the travel of an unindicted co-conspirator who was traveling from Indianapolis through Texarkana and then to Frisco, Texas, was sufficient to establish venue. Why does the government charge in the Eastern District under circumstances like these? Because, of course, we've seen this before. Correct. We charge in the Eastern District because the statute says— I know you're allowed, but why? We have— Supposedly, historically, venue was supposed to have something to do with the parties to the case, you know, where the defendants were and where the public was injured. Well, one thing to keep in mind might be that this was a very large conspiracy case. Just tell us the truth, okay? There's no connection with the Eastern District except that trucks drove through there. Well, I'm not sure that's true because the Cantu Ramirez case, see, there were other prosecutions involving the same ring. In this case, there were other— This is part of a larger conspiracy. So as far as these particular defendants, the acts that we know are they took drugs and drug proceeds through Beaumont. Contreras said when he went— through Beaumont, Lera testified that when he went to Chicago to distribute drugs for Mr. Uriarte that he went through Texarkana and he said that he took four loads from Laredo to Mississippi. And Mr. Gayton testified that he took cocaine to New York, Georgia, Ohio, Tennessee, Illinois, and Mississippi. And he talked about all the different places in the Eastern District that he went through. And so the evidence did show that acts in furtherance of the conspiracy were committed in the Eastern District, specifically Beaumont, Sherman, Texarkana, Tyler, and Plano. And one act by one co-conspirator taken in furtherance of the conspiracy is sufficient to establish venue. Of course, that wasn't my question. I'm sorry, Judge. I thought I was answering it. Well, when the U.S.— Presumably, you had a U.S. attorney in the Southern District of Texas. You had a U.S. attorney in—I assume that's the Northern District of Mississippi. And you had a—maybe because you say it's a widespread conspiracy, you had U.S. attorneys somewhere else, but you chose to indict and prosecute in Plano. And this is what happens, and I hope this answers your question. When the agents are investigating large conspiracies, drug-trafficking conspiracies, they find that the investigation leads them to various parts of the country. And so rather than piecemeal the case, they bring it all together as one conspiracy and put it in the U.S. attorney's office, who is responsible for that investigation. So I think it's more efficient to do it that way. And it certainly doesn't violate anyone's constitutional rights, because the Supreme Court said it doesn't matter if the defendant never set foot in that district. So I think—I really think that's the best answer that I can give you. So if I've answered the question on venue, then I would like to go with or discuss Judge Schell's admission of the evidence that Barges— One last question. Yes. It may be implicit, but normally in these cases—well, I shouldn't say normally. In many cases, the case agent sets the stage and kind of goes through some of this routine stuff of, you know, this overarching conspiracy, da-da-da-da-da-da, where they traveled and all that. In this case, did the case agent establish what you just told us, or is it only the other witnesses that you've alluded to? I don't think I understand. Well, I'm just saying, in many prosecutions at trial, I mean, you put the case agent up there that says the investigation began, they did this, da-da-da-da-da. It's more of a scene-setting kind of testimony. You're going to put all these other people up there, but the jury's able to kind of follow whatever. And so I'm just asking, not something to bark down on, but in this sense, was this something different that the case agent wouldn't put on early to just kind of— when the investigation began, you get them off the stand and you put all these other people, then the jury can follow, you know, what you're saying, or is this one of these where no case agent did it, so the jury has to piece it together based on the other people you've alluded to? That's all I'm asking. Okay. My memory of the progression of the trial is that cooperators testified before the agent about going through places in the Eastern District. Agent or Officer Gottlieb— Let me just ask it this way. We look in the record. Yes, sir. Will I find testimony from the case agent somewhere that says what you've told us about the venue issues in addition to other witnesses? Yes, sir. Fine. That's good. And I believe it's around page 3724. Good. Okay. You can move to the— Okay. So addressing the dog sniff evidence, Mr. Crutcher argued that the government today, he said, did not have a good reason to bring the dog sniff evidence. Well, that's not true. It's important, we think, for the court to know what it was that caused the prosecutor to offer the dog sniff evidence to begin with. The motion in limiting was in place, but what had happened and what the prosecutor told the court was that she wanted to bring the evidence to the jury to refute defense counsel's argument that the investigation was shoddy or lacking because they were not calling drug dogs. She also said that it helps corroborate the other evidence. Did you need the dog alert to have enough evidence to convict Mr. Pierre? I'm sorry? Did you need the dog alert evidence to convict Mr. Pierre? Was he going to be acquitted without the dog alert? No, ma'am. What else was there? Why did you bring the dog evidence? The defense theory, they had basically two defenses. One, and this also goes to the prosecutorial misconduct argument, one, that the witnesses were lying and they were colluding with each other. The second was that the government, particularly the agents as well as the prosecutor, were coaching the witnesses and telling them what to say. So that was part of the main defense, but what had happened was when cross-examining two of the government's witnesses, trying to show that the investigators were lazy or didn't do their job, when Tim Bounds testified, Mr. High School, at pages 1758 to 59, said, did you ask for any type of drug-sniffing dog to come to that location? The answer was, no, I didn't. Mr. High School then asked, did anyone call drug-sniffing dogs to do any type of alert in that truck or those individuals? And he said, no. Mr. Williford also asked the same witness, and you didn't bring a drug dog, correct? Then when Mr. Officer Fontenot was testifying, Mr. High School asked, were there any drugs placed in the vehicle, canine dogs, to alert for any drugs or anything of that nature? Answer, I don't recall. His follow-up question was, that's one of the things y'all do as well, don't you, when you detain people like that, put your dogs in there to alert, to see if there are drugs or drug money. And the witness said, maybe, maybe not, it just depends on the circumstances. So the prosecutor brought it up to show, yes, they were bringing drug dogs at some cases, and Mr. Pierre's house being one of those cases. So that's the context that it was offered in. Judge Schell found that the dog sniff, though, was probative of whether Mr. Pierre was involved in drug trafficking. And he also found that the probative value was not outweighed by the danger of unfair prejudice. So when the court makes its analysis, I think you should keep in mind that the testimony of Officer Dominguez lasted 36 minutes. Six minutes of that testimony was the government basically establishing what the dog found and that the dog handler, and this was on redirect, did not think that Barge made a mistake. What the defense did, they spent 30 minutes questioning, and these are the points that they got to make to the jury. They established on cross-examination that it could have been a false alert. They said no one did a chemical analysis of the drawer where the dog alerted. They established that no drug dog is perfect. And they also established that Barge searched other parts of the house but didn't find anything. So in light of all the things that the defense counsel was able to argue, then he was not unduly prejudiced. He was not substantially prejudiced by the admission of the evidence. And the court has said that it will make a common-sense assessment of all circumstances surrounding the evidence. And before it would reverse, then, the prejudicial effect must substantially outweigh the probative value. And it didn't here. And if there was any error, it was harmless. As I said, the testimony took 36 minutes. This was a 14-day trial. Mr. Pierre was the only one, other than Mr. Kekau, who argued about the drug snag, and both of them argued that it was not reliable. The government did not counter that, said nothing else about the dog sniff during closing. So if the court has no further questions on that topic, then I'll address the prosecutorial. I'm just going to let it go. I still don't know why the government called the dog, but let it go. Yeah, I understand, Your Honor. Okay. This court and other courts have found that when a prosecutor improperly vouches for a witness, then that's prosecutorial misconduct and that's improper. And it's also found that when the government makes an argument based on an emotional appeal that transmits the message that a witness should be believed because they're a police officer or in law enforcement, that that's not proper. But in the case before you now, the prosecutor did neither of those things. And so I would like to talk about three important cases that were cited. And the first one is the Aguilar case that Mr. Pierre cites on page 56 of his brief. He got, with all due respect to counsel, he got the facts wrong in Aguilar. What the court actually said in Aguilar was that the first questions or the first comments that the prosecutor made saying, is there any point in them lying? Why would the agents do that? Why? They don't know him. They have nothing to gain. They're risking their careers, et cetera, et cetera. The court found that was acceptable because that kind of testimony was in evidence. What the court found was not acceptable was the part where the prosecutor argued that the agents were getting a sad deal because that was an emotional appeal to believe the witnesses, the police officers, because they're law enforcement. So in that case, because of that second part, it was point and error because the testimony of those officers was so important. And not only did she say that the agents got a sad deal, the prosecutor there said things like, they strive to protect people like you and me. They put their lives on the line. And you can read the rest of that in the case or in Mr. Pierre's brief. Then I want to talk about the McCann brief, which also, with all due respect, counsel got the holding in that case wrong. What happened in that case was the court found that defense counsel were repeatedly and clearly implying that the police were lying. And so the prosecutor asked on direct examination whether the police had framed the witnesses or whether they had given false testimony. And, of course, they said no. The court said that the prosecutor can argue fair inferences from the evidence that a witness has no motive to lie but cannot express his personal opinion. Okay. And in that case, the court did find the rebuttal portion of the government's remarks improper. And that was because the comment was that the defense attorneys owed the witnesses an apology because they were law enforcement. And so the court said that was an improper remark. But the court did not reverse the case. Instead, the defense counsel had made arguments in his closing that counterbalanced the prosecutor's remarks. And so the substantial rights of the defendant were not prejudiced. And then the McCann case, the one that I just talked about, cites the Doar case. And in the Doar case, the court did find that the prosecutor committed prosecutorial misconduct and even found that it was reversible. But here's what the court said in Doar. The prosecutor went too far in Doar because what the prosecutor argued was that there was no evidence for why the judge accepted the guilty plea. In other words, she was trying to revive an argument that the judge was colluding as well. But the defense had never made that argument. So my recollection is that's why it was reversible. But what the Fifth Circuit said in Doar, giving direction, it said, we may have found no difficulty with the prosecutor's closing argument if he had merely questioned the reasonableness of a conspiracy between the DEA agents, the prosecutor, and the government witness, since defense counsel had suggested that possibility. That's where our case is. The defense counsel, through their closing argument and throughout the questions that they asked various witnesses during the trial, communicated that their defense was, not only are the witnesses lying, they've conspired not only with each other but with the agents and with the government. And I'll give you a few examples of that. In Mr. Keekhous' closing, his attorney said, I'll quote him first, but did the government ever show any of those snitches a picture of the property in P.K. Oon and say, do you recognize that? No, they didn't. Why? Because they had never seen it. The only person who has seen it is Freddy. I don't doubt Freddy has been there to buy some dogs. But did anybody identify the property and say, yeah, that's the house. I've been there. That's the front yard. Did they? No. The government did not ask them to identify it. Why? Because they hadn't been there. So he was accusing the government of failing to ask the witnesses to identify a picture of Mr. Pierre's house as his house, as the place where they, the drivers, like Lara and Gaten, delivered the drugs. And he's accusing the government of not doing that because she knows that they can't. He also said, but I submit to you it's a lie. And if you think, and this was in reference to what did the cooperators talk about during the few times that they did see each other while they were being held in the county jails, and they testified, we didn't talk about the case. We talked about family. That's what most of them said. So Mr. Kekau's argument was, well, that's a lie. And if you think they are lying about that, then they could lie about every single thing. Now, that's fine. But then he said, you go, you the jury. The government wouldn't do that. It is what it is. He also implied that the government was telling witnesses where the defendants were going to be seated in the courtroom, thus tainting their identification is the logical inference from that accusation. I think we barely have your response on that claim. Okay. Well, in that case, I want to respond then, since I have a few minutes left, to a comment that was made by Mr. Pierre's attorney when he was asked this morning about whether the jury heard crackhead Bill, that alias. They didn't hear that because the court instructed that nobody use it. But for counsel to say the government just made that up I think is wholly inappropriate. You got a copy of the indictment, didn't they? They did. The jury did. Crackhead Bill on the indictment? No. No, ma'am. They deleted it from the indictment, I think right before the indictment went back. It was on the caption we have. Right. And it was on the caption before. But I think before they sent the indictment back to the jury, they deleted that. So the jury never saw it. You have nothing to say about the sentencing issues? I'm happy to talk about the sentencing issues. I'll talk about, first, Mr. Uriarte's claim, then, that there was no evidence that he gave any instructions, and, of course, keeping in mind that the standard at sentencing is preponderance of the evidence and that the court has a great deal of discretion in deciding what testimony to accept, and that allegations, facts set out in the PSR, are sufficient for the judge to rely on. And in this case, as to the enhancement, the PSR said that Mr. Uriarte should have actually received the higher offense, the higher, the four-point enhancement, because he was controlling Mr. Uriarte, and that Mr. Uriarte was hiding drugs, keeping drugs for him, and collecting proceeds for Mr. Uriarte. And also, the government disagreed with the court during sentencing, as we do now. We think that Mr. Uriarte's direction and control over the drivers who were taking cocaine, especially the ones who took it to Chicago, that he did have sufficient control over the drivers to justify the application of the roll enhancement. And — Conceded error on — is it Keiko? Yes, sir, on the premises enhancement, we did. So, Judge Schell found that the Roening factors were met, that the evidence was sufficient. And in Roening, this Court said that a leader's — unlike a manager, which is what the Court found Uriarte was, a leader's or an organizer's actions must directly affect other people. Consequently, a leader or organizer must control or influence people. Well, Mr. Uriarte did influence people.  And we stand by the drug calculations, because they were very conservative. All right. Okay? And since I'm out of time, then — Thank you. — we'll stand as — All right. Mr. Gretzer, you have some rebuttal, if you choose to use it. Yes. I think I'd like to begin, Judge Jones. I think I can give you a very direct answer to the question you spent the first six minutes asking the prosecutor why the government brings these cases in the Eastern District of Texas. And I think the answer is probably because they can. As Judge Costa pointed out in his special concurrence in the Roening's opinion, some of these Supreme Court venue cases are very old. It was simply a very different time in American history. And perhaps the case law hasn't kept up. Well, there is a clause in the government's brief that talks about the North Texas high-intensity drugs, whatever. So I guess maybe that's headquartered in Plano. Who knows? Well, unfortunately, Plano, Collin County, is in the Eastern District of Texas. I think in my brief I said that these constitutional rights can't be sacrificed on the altar of suburban sprawl from the metroplex. And I know Plano is a very different area 20 to 30 years ago. And maybe a lot of people live in Plano, work in Dallas, or vice versa. One point, I think from the record that would accentuate my point, on page 2180 of the record, there was a questioning of the Chief Agent Gottlob. They were asking him why he didn't interview a certain manner of witnesses in your investigation. Question, did that happen in this case, Agent, where any of these witnesses appeared before the federal grand jury here in the Eastern District of Texas? Answer, not that I can bring to mind right now in this case. Question, whose decision was it not to have them give foreign testimony in front of the local federal grand jury? Answer, that would be a decision between the investigator and the prosecutor. I think this becomes important to Jones, as you said in your questioning to the prosecutor here, that, you know, historically venues were supposed to have some connection with the locale of the people who were brought to trial there. In Mr. Pierre's defense, and we've established before he has some pretty sophisticated defense lawyers, he, of course, is from here in New Orleans. He had a large number of witnesses who testified by videoconference. They went to some room here in the Hale Boggs District Courthouse adjacent to where we are today, and they were able to testify remotely there in Plano. I think that is a nice modern accommodation, but it shows why historically one would expect to be brought to trial in a district where they had some substantial connection, maybe not someone who, you know, lives in Dallas, but it's called the Triumph Plano, but people like my client who live in New Orleans and are brought to trial, you know, hundreds of miles away in a very different state. I think there's a lot of the same issues that Judge Costa flagged in his special concurrence in Romans, and it may be an issue that in a cert petition, perhaps in our case or some other one, that a future Supreme Court might want to address. Did he have a jury of his peers? I'm sorry? So he didn't have a jury of his peers? Well, I don't know. I couldn't say he didn't have a jury of his peers. And when people often say, you know, that we come from different socioeconomic strata or whatever, I don't think that was the issue as much as there were historical reasons. I'm no expert in it. Judge Costa talks about them in some of his. I get that. I'm just saying on a practical sense, as long as they can, you know, that doesn't get you to error. I understand that. If they're wise to do it, maybe a different question. But, you know, if they can do it, you know, it's a prosecutorial decision. Like why do they charge somebody with 50 counts when three counts would do it, you know? I was trying to answer directly the question that Judge Jones had posed, not a positive statement but a normative statement, why they do things. Secondly, I'd like to take some issue with the statement I think the prosecutor began her argument with, where she said that I had, I think in some sense, been an error, that Ms. Rutan was impelled to revisit this pretrial ruling excluding the dog, that had been in effect for a year because the defense counsel had cross-examined some case agents about drug dogs. And respectfully, that's not what happened here at all. Page 3595 of the record. This is only the sixth page of the transcript on that July 3rd day of trial, or two weeks from the trial at this point, that I mentioned in my opening. The court, as I said in my opening, was aggravated. Okay, wait a minute. Every morning we have an issue like this and the jury sits in there. Could you not have raised this yesterday afternoon, Ms. Rutan? Answered by the prosecutor. Your Honor, we left at 630 last night after hearing another matter. The court seemed tired. That's why I didn't raise it. I'm afraid I don't see there that somehow the defense questioning of case agents impelled them to revisit this issue. If you don't, if the government really felt this way, they could have simply objected to the magistrate's report and recommendation, and Judge Schell might have done a number of things with it, but at least if he was going to allow this in, or he said you're going to open the door if you cross these case agents on other issues with dogs, then that might have given a more fair set of evidence. The problem is anytime you change the rules in the middle of the game, and that's really what happened here. Again, the limited nature, even of what the government could bring in the Bart J. Dog testimony for, the government's whole theory was that all these drugs had been kept in the tree line of Mr. Pierre's house. The dog did not find any drugs in the tree line.  And the only thing he scratched was this one little drawer in his bedroom. At most, that could have shown a personal use quantity. Obviously, one cannot store multiple kilos of cocaine at any point in time in the past, obviously not here, in one little dresser drawer. That shows why, Judge Clement, you asked again why the government brought this dog. I think it's because they knew they had a marginal case, and this was their one chance. They had not revisited this. It dawned on them, not because we had this myriad of cross-examined case agents, but it dawned on them this was the way for them to sort of tick the ball in their favor as we got towards the end of trial. It seemed to me that you all got more out of the cross-examination than the government got out of the fake alert. We were able to aggressively cross-examine the agent. Of course, that's the defense lawyer's task to do. But again, it was like, please don't help us. I mean we had structured this defense around a very certain particular set of parameters, and the prosecutor chose to change this. And, of course, as I pointed out, the judge was obviously upset at having been sprung on this after the jury was already there that morning. At least if the government had brought this in, notwithstanding everyone seemed tired at 6.30 the night before, at least there might have been a little bit more than a few-minute conversation with the Article III judge. And, of course, there would have been like, I think it was like a three-and-a-half-hour or four-day testimony at the suppression hearing. Thank you, Judge. Both of us. Yes. All right. Thank you. All three of you are court-appointed counsel, and the court does appreciate your work in this case, but in addition to all the other cases that you accept as court-appointed, we appreciate it. And the case will be submitted, and we'll decide it. Thank you. Always glad to be of service. Thank you.